# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

NORA J. CAMPBELL,                    )
      Plaintiff,                    )
                                  )
    v.                            )
                                  )    CAUSE NO.: 2:11-CV-338-PRC
MICHAEL J. ASTRUE,                   )
Commissioner of the Social Security  )
Administration,                      )
      Defendant.                   )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Nora Campbell on September 13, 2011, and Plaintiff's Memorandum in Support of Her Motion for Summary Judgment [DE 18], filed by Ms. Campbell on February 27, 2012. Ms. Campbell requests that the decision of the Administrative Law Judge denying her supplemental security income and disability insurance benefits be reversed and remanded for further proceedings. On April 11, 2012, the Commissioner filed a response, and on April 25, 2012, Ms. Campbell filed a reply. For the following reasons, the Court grants Ms. Campbell's request for remand.

## PROCEDURAL BACKGROUND

On March 21, 2007, Ms. Campbell filed concurrent applications for supplemental security income ("SSI") and disability insurance benefits ("DIB") with the U.S. Social Security Administration ("SSA") alleging that she became disabled on January 1, 2007, due to high blood pressure and pain in her right leg. (Administrative Record, hereafter AR. 90, 175-77, 185-87). Ms. Campbell's applications were denied initially on May 14, 2007, and again upon reconsideration on July 26, 2007. (AR. 73-76, 77-80, 88-90, 91-93).

On March 29, 2010, Administrative Law Judge ("ALJ") Patrick Nagle held a video hearing at which Ms. Campbell and a vocational expert testified. (AR. 26-57). On April 30, 2010, the ALJ issued a decision finding Ms. Campbell not disabled and denying both her SSI and DIB. (AR. 11-21). The ALJ made the following findings under the required five-step analysis:

1. The claimant meets the insured status requirements of the Social Security Act through March 1, 2011.

2. The claimant has not engaged in substantial gainful activity since January 1, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: knee pain, obesity, hypertension which is well controlled with medication, [and] low back pain (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, . . . the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can never climb ladders, ropes or scaffolds; occasionally climb ramps or stairs and occasionally crouch; and can frequently balance, stoop, kneel and crawl. The claimant needs to avoid concentrated use of hazardous machinery and must avoid concentrated exposure to wet and slippery surfaces and uneven terrain. Additionally, work should be limited to simple, routine and repetitive tasks to accommodate complaints of pain.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on October 25, 1960 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

*Id.*

On June 14, 2010, Ms. Campbell filed a request for review, which the Appeals Council denied on July 29, 2011, leaving the ALJ's decision the final decision of the Commissioner. (AR. 1-3, 7).

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A. Background

Ms. Campbell was born in 1960. (AR. 20). She was 49 years old when the ALJ issued his decision and 46 years old at the date of the alleged onset of disability. (AR. 20, 278). She testified that she had trouble in school, particularly with reading and writing. (AR. 45-46). She took special education classes in both junior high and high school, received mostly low grades, and failed 10 classes before she dropped out of school in the eleventh grade. *Id.*

## B.  Medical Evidence

In December 2006, Ms. Campbell visited East Chicago Community Health Center for a check-up and complained of occasional pain in her right knee.  (AR. 294-95).  In February 2007, Plaintiff complained of having constant pain and swelling in her right knee after she fell a month earlier.  (AR. 292).  An x-ray of her right knee was taken and she was prescribed Ibuprofen for the pain.  (AR. 293).  In March 2007, Ms. Campbell had another x-ray, which indicated mild to moderate osteoarthritis of her right knee.  (AR. 290-91, 336).

On May 8, 2007, Dr. Adela Perez, a licensed physician for the SSA Disability Determination Bureau, performed a consultative evaluation of Ms. Campbell.  (AR. 297-300).  In her consultative report, Dr. Perez noted that Ms. Campbell weighed 296 pounds and was five feet, four inches tall.  (AR. 298).  She documented Ms. Campbell's complaints of severe and constant pain as well as stiffness, and noted that her pain was exacerbated by walking, going up or down stairs, and sitting for 30 minutes, but that she did not require an assistive device to walk.  (AR. 297).  Upon examination, Dr. Perez found that Ms. Campbell had mild tenderness and a decreased range of motion in her right knee.  (AR. 297, 299, 300).  She concluded that Ms. Campbell's constant right knee pain was possibly related to osteoarthritis and she was morbidly obese.  (AR. 299).  Dr. Perez further opined that Ms. Campbell suffered from hypertension, but her present medication was effectively controlling it at that time.  *Id.*  Dr. Perez found no other physical or mental problems to report and found Ms. Campbell's mental capacity to be "grossly normal."  *Id.*

Several weeks later, on May 12, 2007, Dr. Fernando Montoya, a state agency medical consultant, reviewed the medical evidence and assessed Ms. Campbell's physical residual functional capacity ("RFC") to perform work-related activities.  (AR. 302-309).  In evaluating the medical

record, Dr. Montoya noted that Ms. Campbell's range of motion was within normal limitations except for her right knee. (AR. 303). He opined that she could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand or walk for about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push or pull without limitation. *Id.* Dr. Montoya assessed Ms. Campbell as being able to occasionally climb ramps or stairs, frequently balance, stoop, kneel, or crawl, and occasionally crouch. (AR. 304). He also determined that Ms. Campbell should never climb ladders, ropes, or scaffolds and should avoid concentrated exposure to wet, slippery surfaces, and uneven terrain. (AR. 304, 306). Furthermore, Dr. Montoya opined that the available evidence supported Ms. Campbell's allegations regarding the nature of her impairments but did not support her allegations regarding the severity of her impairments. (AR. 307). About two months later, in July 2007, another state agency medical consultant reviewed the medical evidence and affirmed Dr. Montoya's RFC assessment. (AR. 329).

In June and August 2007, Dr. Ricardo Hood of East Chicago Community Health Center evaluated Ms. Campbell, who reported continued right leg pain and several falls during the past nine months. (AR. 328, 345). Dr. Hood found tenderness and tendinitis in her right thigh but no swelling or deformity. (AR. 345). Then, several months later, in October 2007, Ms. Campbell again reported to Dr. Hood that she had right leg pain and frequent falls. (AR. 344).

In February 2008, Ms. Campbell was hospitalized for ulcers. (AR. 333). Later that month, Dr. Hood re-evaluated Ms. Campbell for the purposes of receiving disability benefits. (AR. 343). At that time, she reported right leg pain, hip pain, and lower back pain, which she attributed to multiple falls in the past year. *Id.* Dr. Hood found tenderness in her lower back, right knee, and right ankle but found no deformity. *Id.* He opined that Ms. Campbell exhibited a full range of

motion.  *Id.*  She returned to Dr. Hood in March, June, July, and October 2008 with the same complaints of pain.  (AR. 337-42).  Finding no changes, Dr. Hood repeatedly adjusted her pain medication and recommended she add exercise and calorie counting to her daily routine.  *Id.*  Dr. Hood's December 2008 report indicated degenerative arthritis in both knees.  (AR. 336).  X-rays from that visit revealed degenerative changes in the left knee and significant degenerative changes in the right knee.  (AR. 335).  Dr. Hood recommended weight loss and dietary changes.  (AR. 336).

In January 2009, Ms. Campbell saw Dr. Hood to get her pain medication prescription refilled and, in March 2009, she saw him to follow-up after her February 2008 hospitalization.  (AR. 333-34).  Ms. Campbell returned to Dr. Hood again in April 2009 for medication prescription refills and reported developing pain in her left side.  (AR. 332).

About seven months later, on August 11, 2009, Mr. Filimal Ramos, a physician's assistant to Dr. Hood, at the East Chicago Community Health Center, assessed Ms. Campbell's physical RFC to do work-related activities.  (AR. 352-56).  In his assessment, Mr. Ramos initially noted that he had treated Ms. Campbell since June 2007.  (AR. 352).  Mr. Ramos then indicated that Ms. Campbell could not walk more than one half of a city block without requiring rest or experiencing severe pain due to her bilateral knee pain and progressively worsening right knee.  (AR. 352-53). He next found that Ms. Campbell could not sit or stand at one time for longer than five or 10 minutes and could only sit, stand, or walk for a total of less than two hours in an eight-hour work day.  (AR. 353-54).  Mr. Ramos determined that she would need a job that would allow for shifting positions at will from sitting, standing or walking, and one that permitted at least two to three unscheduled 10 minute breaks during an eight-hour day and involved only moderate stress.  (AR. 353-54). Furthermore, Mr. Ramos opined that Ms. Campbell would need to elevate her legs after prolonged

sitting, could only occasionally lift and carry 10 or fewer pounds, and could never lift or carry 20 or more pounds. (AR. 354).

In September 2009 and February 2010, Dr. Hood's physical examinations of Ms. Campbell indicated no new physical symptoms and therefore Dr. Hood did not suggest any changes in her treatment or therapy. (AR. 357-63, 364-67).

### C. Ms. Campbell's Testimony

At the administrative hearing, Ms. Campbell testified that she became disabled in January 2007 because, at that time, her legs would often "just give out," causing frequent falls, and her ongoing leg problems, which began in 2004, interfered with her ability to do her housekeeping job. (AR. 32). She testified that, in addition to her leg problems, she has hypertension, ulcers, and severe pain in her back, side, and knees. (AR. 33, 35-37, 39, 41). Ms. Campbell explained that her doctor predicted that eventually she would need knee replacements. (AR. 34.) She indicated that she took pain medications but that, on a scale of one to 10, her pain on an "ordinary day" reached an "eight." (AR. 47). She testified that her pain interfered with her concentration. (AR. 47-48).

Ms. Campbell explained that she lived alone and was able to do normal household tasks, which included preparing meals as well as cleaning her bathroom and bedroom. (AR. 37-38). She indicated that she generally confined herself to one room to avoid having to clean the entire house. (AR. 37-38). Ms. Campbell testified that she had to ask her neighbors to take her to the store and carry her groceries into the house. (AR. 33, 37). She could not stand or walk for long periods of time; she could only stand for 15 minutes until her side pain required her to sit and could only walk four blocks until she needed to use the restroom. (AR. 36, 39). Ms. Campbell had frequent urination problems, requiring her to use the restroom approximately 12 times a day. (AR. 48). She

testified that she left the house only to visit the doctor or the store and sometimes stayed inside for five days at a time. (AR. 38). While in her house, she stood up or walked around more frequently than she sat down. (AR. 39).

Ms. Campbell further testified that, for the past five years, she had difficulty sleeping because living alone made her anxious and agitated. (AR. 40). She explained that she often went many days without sleeping. *Id.* She testified that she got approximately five hours of sleep per week. (AR. 41).

### D. Vocational Expert Testimony

At the administrative hearing, the ALJ posed this first hypothetical to the vocational expert ("VE"): I want you to assume "a younger individual who has an [eleventh] grade education and shares the claimant's vocational profile. For purposes of this question, assume the individual could perform light work . . . [meaning] the ability to lift up to 20 pounds occasionally, lift or carry up to 10 pounds frequently, stand or walk for approximately 6 hours in the 8-hour workday, [and] sit for approximately 2 hours per 8-hour workday." (AR. 53). This hypothetical individual could not climb ladders, ropes or scaffolds, could occasionally climb ramps or stairs and crouch, could frequently balance, stoop, kneel, and crawl, would need to avoid concentrated exposure to hazardous machinery, wet surfaces and uneven terrain, and would be limited to simple, routine, and repetitive tasks. *Id.* Based on these limitations, the ALJ asked if there are jobs in the economy that this individual could perform. *Id.* The VE responded to this hypothetical with three job titles: production assemblers, small parts assemblers, and electronics workers. (AR. 54). The VE testified that, combined, there were approximately 15,000 jobs in those categories. *Id.*

The ALJ also asked the VE about the same hypothetical person with the added limitation that the individual would be "off task approximately 20 percent of the time." *Id.* The VE responded that no competitive employment would exist for such a person because "the off task amount of time would interfere with the . . . minimally required productive activity or the attention required to the task within each of [those] occupations or any of the other unskilled occupations that she would be capable of performing otherwise." (AR. 55). After questioning him, the ALJ asked the VE if his testimony was consistent with the Dictionary of Occupational Titles, to which the VE responded in the affirmative. *Id.*

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning

of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to [his] conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be

expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC. "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000. The ALJ must assess the RFC based on all the relevant

evidence of record. *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Id.* at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Ms. Campbell seeks reversal and remand of the ALJ's decision for the following reasons: (1) the ALJ improperly rejected the opinion of her treating physician's assistant under Social Security Ruling ("SSR") 06-3p; (2) the ALJ improperly assessed her credibility under SSR 96-7p; (3) the ALJ improperly assessed her RFC under SSR 96-8p; and (4) the ALJ improperly analyzed the impact her obesity had on her other impairments under SSR 02-1p. The Court considers each of the asserted grounds for remand in turn.

### A. Opinion of Treating Physician's Assistant

Ms. Campbell contends that the ALJ made a number of reversible errors in evaluating and weighing the medical evidence. (Pl.'s Mem. at 5-8). She specifically argues that the ALJ erred in rejecting the August 2009 RFC assessment (hereinafter "opinion") of Dr. Hood's physician's assistant, Mr. Ramos, who opined that she is limited to performing less than sedentary-level work. *Id.* Ms. Campbell asserts that the ALJ incorrectly found that there was "no evidence in the record" that Mr. Ramos treated her for a two-year period and there were "no treatment notes" in the record to support Mr. Ramos's opinion. *Id.* at 6. The Commissioner responds that it was reasonable for the ALJ to reject Mr. Ramos's unsupported opinion because there is no evidence in the record that he treated Ms. Campbell during the relevant period and Dr. Hood's examinations indicated very few abnormal clinical findings. (Def.'s Mem. at 6-7). Therefore, according to the Commissioner,

because Dr. Hood's treatment notes do not support Mr. Ramos's opinion about Ms. Campbell's "extreme limitations," the ALJ properly discounted his opinion. *Id.*

In evaluating opinion evidence, the SSA distinguishes between medical evidence from "acceptable medical sources" and "other sources." SSR 06-03p, 2006 WL 2329939, at *1-2. "Acceptable medical sources" include licensed physicians and psychologists, while "other sources" include, for example, nurse practitioners and physicians assistants. *Id.* Specifically, SSR 06-03 provides:

> Information from these "other sources" cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

2006 WL 2329938, at *2. While opinions from other medical sources are not entitled to controlling weight, "[i]n deciding how much weight to give to opinions from these 'other medical sources,' an ALJ should apply the same criteria listed in § 404.1527(d)(2)."[1] *Phillips v. Astrue*, 413 F. App'x 878, 884 (7th Cir. 2010). In other words, the ALJ should apply the same criteria used to evaluate medical evidence from "acceptable medical sources", such as:

- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with the other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
- How well the source explains the opinion;
- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

---

[1] The criteria set forth in 20 C.F.R. § 404.1527(d)(2) includes: (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the doctor who is providing the opinion, and (6) any other factors that tend to support or contradict the opinion.

• Any other factors that tend to support or refute the opinion.

SSR 06-03p, 2006 WL 2329939, at *4-5.

In his decision, the ALJ gave "little weight" to Mr. Ramos's August 2009 opinion for a number of reasons. (AR. 19-20). First, the ALJ discounted Mr. Ramos's opinion because he found there was no evidence in the record that he began treating Ms. Campbell in June 2007; instead, the ALJ relied on Ms. Campbell's testimony that she began treatment with Mr. Ramos in April 2009. (AR. 19, 34). But here the record is unclear regarding the period of time that Mr. Ramos treated Ms. Campbell. This Court's review of the record establishes that Ms. Campbell began treatment at East Chicago Community Health Center as early as December 2006, and none of the treatment notes specifically list Mr. Ramos's name. The notes either list Dr. Hood's name as the healthcare provider or they do not list any healthcare provider. (*See e.g.*, AR. 290-95, 327-28, 332-48, 360-67). However, at the administrative hearing, Ms. Campbell's attorney explained that Mr. Ramos treated Ms. Campbell under Dr. Hood's signature.[2] (AR. 30-31, 33-34). But the ALJ neither discussed nor acknowledged Ms. Campbell's attorney's explanation regarding Mr. Ramos's treatment of Ms. Campbell in his decision. The ALJ never contacted Mr. Ramos to obtain any explanation about the period of time he treated Ms. Campbell and there is no way for this Court to tell if the ALJ disbelieved Ms. Campbell's attorney's explanation. Accordingly, the ALJ's lack of articulation precludes this Court from being able to "trace the path of his reasoning and to be assured that the ALJ considered the important evidence." *Scott*, 297 F.3d at 595.

---

[2] At the hearing, Ms. Campbell's attorney stated that Mr. Ramos is a nurse practitioner who is overseen by Dr. Hood. (AR. 30-31, 33-34). However, this Court's review of the record indicates that Mr. Ramos is a certified physician's assistant. (AR. 356).

Next, the ALJ discredited Mr. Ramos's opinion regarding Ms. Campbell's limitations because there were no treatment notes from Mr. Ramos that support the "extreme limitations" that he expressed in his opinion.  (AR. 19).  However, this Court' s review of the record shows that the East Chicago Community Health Center treatment notes reflect that Ms. Campbell was diagnosed with right knee osteoarthritis and degenerative arthritis of both knees; x-rays indicated degenerative changes of the patella of the left knee and significant degenerative changes of the right knee with tricompartmental osteophytes and joint effusion with loss of lateral joint space.  (*See* AR. 290-91, 335-36).  And Ms. Campbell consistently complained of leg and knee pain and falling down because her knees give out on her.  (*See e.g.*, AR. 290, 292, 294, 332, 334, 337, 341, 342, 343, 344, 345). So while the ALJ found that the record did not specifically contain treatment notes from Mr. Ramos that support his August 2009 opinion, there *is* medical evidence in the record that supports his opinion even though it is unclear if Mr. Ramos, Dr. Hood, or another physician is the author of the treatment notes.

In discounting his opinion, the ALJ made a conclusory determination that the treatment notes in the record did not support Mr. Ramos's August 2009 opinion without adequately explaining the basis for that decision.  Despite the ALJ's deficiency, the Commissioner attempts to defend him by pointing out that Dr. Hood's clinical examinations produced few abnormalities and indicated Ms. Campbell had a normal gait, sensation, muscle tone, and muscle strength as well as no swelling, deformities, or abnormalities in her lower extremities.  (Def.'s Mem. at 6-7).  But here the Commissioner's defense of this aspect of the ALJ's decision relies on precluded post-hoc rationalization because the ALJ never articulated these reasons in his analysis.  *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003) ("[G]eneral principles of administrative law preclude

the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."); *McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010) ("[I]t [is] improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on in its decision.").

Furthermore, the ALJ discredited Mr. Ramos's opinion because he viewed it as being "a sympathetic opinion based on the claimant's subjective complaints." (AR. 20). But here the ALJ offers no record support for his conclusion. *See White ex. rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) ("Speculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence."). Accordingly, this basis for rejecting Mr. Ramos's opinion constitutes reversible error.

This is a case where the ALJ needed to solicit additional information from Mr. Ramos. "An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(3)); *see also* SSR 96-2p, 1996 WL 374188, at *4 ("[I]n some instances, additional development required by a case–for example, to obtain more evidence or to clarify reported clinical signs or laboratory findings–may provide the requisite support for a treating source's medical opinion that at first appeared to be lacking or may reconcile what at first appeared to be an inconsistency between a treating source's medical opinion and other substantial evidence in the case record."). Because the ALJ has a "duty to develop a full and fair record," he should have contacted Mr. Ramos for clarification of his August 2009 opinion that Ms. Campbell is limited to performing less than sedentary-level work, asking for more detail with respect to the medical evidence and treatment records he relied on in assessing her RFC and clarifying the length of Mr. Ramos's

treatment of Ms. Campbell. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (finding that an ALJ's duty to develop the record included soliciting updated medical records when the ALJ did not afford the treating physician's opinion controlling weight). Accordingly, on remand, the ALJ must recontact Mr. Ramos to clarify his opinion and, if necessary, obtain an updated RFC assessment of Ms. Campbell's limitations. After the ALJ receives an updated or clarified medical opinion, the ALJ shall apply the criteria listed in SSR 06-03p in evaluating and weighing Mr. Ramos's opinion. *See Phillips*, 413 F. App'x at 884-85.

## B. Credibility Determination

Ms. Campbell avers that the ALJ made a number of reversible errors in assessing the credibility of her testimony. (Pl.'s Mem. at 8-10). Ms. Campbell first claims that the ALJ erred by using the boilerplate wording criticized by the Seventh Circuit, which resulted in the ALJ assessing the credibility of her testimony after he developed the RFC finding. *Id.* Next, she asserts that the ALJ impermissibly "played doctor" when he found that her medical treatment was "fairly conservative" and there were "large gaps" in her treatment history because he never discussed how this lack of treatment undetermined her credibility. *Id.* at 10.

In response, the Commissioner contends that the ALJ properly evaluated the credibility of Ms. Campbell's subjective complaints and found them to be "not fully credible." (Def.'s Mem. at 7-8). Here, according to the Commissioner, the ALJ thoroughly explained his credibility determination by discussing the nature and severity of Ms. Campbell's symptoms, the clinical examination findings, the advice of Ms. Campbell's primary care physician that she exercise by walking on a daily basis, the medical opinions, the conservative nature and gaps in Ms. Campbell's

treatment history, and the testimony that she only slept five hours per week. *Id.* Therefore, the Commissioner asserts that the ALJ's credibility determination is supported by substantial evidence.

The Social Security Rulings provide that, in making a disability determination, the ALJ will consider a claimant's statement about her symptoms, including pain, and how they affect the claimant's daily life and ability to work. *See* 20 C.F.R. §§ 404.1529(a); 416.929(a). However, subjective allegations of disabling symptoms alone cannot support a finding of disability. *See id.* The Rulings establish a two-part test for determining whether complaints of pain or other symptoms contribute to a finding of disability: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. *Id.*

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3). In making a credibility determination, SSR 96–7p specifically requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the

symptoms and how they affect the individual, and other relevant evidence in the case record." SSR 96–7p, 1996 WL 374186, at *1; *see also Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

An ALJ's credibility determination is entitled to substantial deference by a reviewing court and will not be overturned unless the claimant can show that the finding is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). However, where the credibility determination is based on objective factors rather than subjective considerations, an ALJ is in no better position than the court and so the court has greater freedom to review it. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In either case, the ALJ must provide an explanation for his credibility assessment that is sufficient to give the reviewing court a fair sense of how he weighed the claimant's testimony. *See Zurawski*, 245 F.3d at 887. The ALJ's credibility determination, overall, must construct a "logical bridge" from the evidence to the conclusion. *See Myles v. Astrue*, 582 F.3d 672, 674 (7th Cir. 2009); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

First, Ms. Campbell argues that the ALJ erred by making a conclusory determination relying on boilerplate language and improperly waiting until after he assessed her RFC to evaluate the credibility of her allegations. In this case, the ALJ stated that Ms. Campbell's allegations as to the intensity, persistence, and limiting effects of her symptoms were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." (AR. 18-19). The Seventh Circuit has held that credibility statements such as the ones used here are "precisely the kind of conclusory determination that SSR 96-7p prohibits." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787-88 (7th Cir. 2003) (noting that such statements "turn the credibility process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather

than evaluating [the claimant's] credibility as an initial matter in order to come to a decision on the merits"); *see also Martinez v. Astrue*, 630 F.3d 693, 696 (7th Cir. 2011); *Phillips*, 413 F. App'x at 886-87 (7th Cir. 2010); *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010) (labeling almost identical language as "meaningless boilerplate" that "yields no clue to what weight the trier of fact gave the testimony").

If the sentence cited by Ms. Campbell encompassed the totality of the credibility finding in the ALJ's decision, it would indeed be improper. *See Parker*, 597 F.3d at 922. However, as the Commissioner argues, the ALJ did not limit himself to a conclusory statement regarding Ms. Campbell's credibility. Instead, the ALJ considered specific aspects of Ms. Campbell's testimony regarding her sleeping patterns, frequency of bathroom breaks, pain management, and activities of daily living and, upon comparison to the record and his own observations of Ms. Campbell at the hearing, concluded that her testimony was "vague," "exaggerated," and "not consistent with the medical records." (AR. 19).

Additionally, SSR 96-7p, interpreting 20 C.F.R. §§ 404.1529 and 416.929, instructs ALJs to consider "observations [about the claimant] recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings" in their credibility evaluations. SSR 96–7p, 1996 WL 374186, *6. However, the ALJ must do so in the context of his overall evaluation of the credibility of the individual's statements and "based on a consideration of all the evidence in the case record" rather than basing his conclusions on personal observations alone. *Id.* at 8. In this case, the ALJ stated that Ms. Campbell's "characterization of pain was not consistent with the medical records." (AR. 19). Yet, in his analysis, the ALJ appears to have focused almost entirely on his observations of Ms. Campbell's demeanor during the hearing as

support for his finding rather than discussing the relevant record evidence as required by SSR 96-7p. *Id.* However, the consistency and credibility of Ms. Campbell's allegations about her symptoms rely in part on the weight that the ALJ gives to opinion evidence in the record. SSR 96-7p, 1996 WL 374186, at *5-6. Here, the ALJ's evaluation of Ms. Campbell's testimony necessarily hinges in part on his evaluation of Mr. Ramos's opinion which, as the Court stated above, requires further inquiry and clarification, upon remand.

Next, Ms. Campbell contends that the ALJ found her allegations regarding the severity of her symptoms incredible because he characterized her medical treatment as being "fairly conservative." (AR. 19). She avers that the ALJ failed to sufficiently articulate his reasoning for this finding; instead, he merely referenced the fact that she had not had surgery or been referred to see a specialist. *Id.* Here, the Commissioner offers little in the way of response beyond reiterating the ALJ's statement and asserting that substantial evidence supports the ALJ's finding. The Court agrees with Ms. Campbell that the ALJ seems to have made his own independent medical determination that the care she received was "fairly conservative" without explaining how that treatment was conservative or why the treatment did not support her allegations. *See e.g., Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"); *Sayles v. Barnhart*, No. 03 C 7325, 2004 WL 3008739, at *25 n. 25 (N.D. Ill. Dec. 27, 2004) (finding that the ALJ impermissibly "played doctor" because the treatment the claimant received was "routine in nature" and "not generally the type of medical treatment one would expect from a totally disabled individual").

Furthermore, the ALJ found that Ms. Campbell's credibility was undermined by the "large gaps" in her treatment history. (AR. 19). But here again the ALJ failed to identify what those gaps

were or how they undermined Ms. Campbell's allegations of disabling symptoms. Moreover, this Court's own review of the record indicates that Ms. Campbell sought fairly routine medical treatment. For example, Ms. Campbell sought treatment in March, April, June, August and October of 2007; February, March, June, October, and December of 2008; and March, April, and September of 2009. (AR. 290, 292, 327, 332, 333, 334, 335, 337, 341, 342, 343, 344, 345, 364). Accordingly, the ALJ failed to construct a logical bridge from the evidence to his credibility finding because he "did not identify the 'gaps'" in Ms. Campbell's treatment history. *See Eskew v. Astrue,* 462 F. App'x 613, 616 (7th Cir. 2011).

Based on these shortcomings, the Court cannot uphold the ALJ's credibility determination. On remand, the ALJ is directed to reassess Ms. Campbell's credibility in accordance with SSR 96-7p by weighing her subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors: her daily activities; the location, duration, frequency, and intensity of her pain or other symptoms; any precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; the treatment, other than medication, for relief of pain or other symptoms, and any other measures she takes to relieve her pain or other symptoms. In other words, the ALJ must evaluate her complaints of severe knee and leg pain in light of the record as a whole.

### C. Residual Functional Capacity Determination

Ms. Campbell argues that the ALJ's RFC finding was improper because there was no medical or other basis for the assessment. (Pl.'s Mem. at 11-12). In support of her position, Ms. Campbell first points out that a medical expert did not testify at the administrative hearing. *Id.* at 11. Next, she asserts that while the ALJ gave "some weight" to the state agency medical

consultant's opinion that she could perform medium work, the ALJ ultimately crafted an RFC for light work.  *Id.* Moreover, Ms. Campbell argues that the ALJ erroneously failed to consider the impact her obesity has on her other impairments when he assessed her RFC.  *Id.* at 12-13. Therefore, according to Ms. Campbell, the ALJ's RFC finding was erroneous because it was based on his own independent medical determination and did not include all of her limitations.

The Commissioner responds that the ALJ properly assessed Ms. Campbell's RFC in light of the medical evidence in the record, which included consideration of the medical opinions. (Def.'s Mem. at 5-6).  Here, the Commissioner points out that the RFC does not need to be based on a specific medical opinion because it is a determination that is reserved to the ALJ.  *Id.*  The Commissioner contends that two reviewing state agency physicians opined that Ms. Campbell could perform medium work but the ALJ deferred to her subjective complaints and limited her further to a reduced range of light work.  *Id.* at 6.  Moreover, the Commissioner avers that the ALJ properly addressed Ms. Campbell's obesity and the effects it could have on her other impairments when he made his RFC finding.  *Id.* at 8 n.1.  Therefore, according to the Commissioner, the ALJ's RFC finding is reasonable and supported by substantial evidence.  *Id.*

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations."  *Young*, 362 F.3d at 1000; *see also* 20 C.F.R. §§ 404.1545(a)(1); 416.1545(a)(1). In evaluating a claimant's RFC, an ALJ is expected to take into consideration all of the relevant evidence, including both medical and non-medical evidence.  *See* 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3).  According to SSA regulations:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work

activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7. Although an ALJ is not required to discuss every piece of evidence, he must consider all of the evidence that is relevant to the disability determination and provide enough analysis in his decision to permit meaningful judicial review. *Clifford*, 227 F.3d at 870; *Young,* 362 F.3d at 1002. In other words, the ALJ must build an "accurate and logical bridge from the evidence to his conclusion." *Scott*, 297 F.3d at 595 (citation omitted).

In this case, the ALJ assessed Ms. Campbell's RFC and determined that she could perform light work that is limited to simple, routine, and repetitive tasks in order to accommodate her pain. (AR. 15). The ALJ stated that he based his assessment on the objective medical evidence in the record and also gave "some weight" to the opinion of the state agency medical consultant, Dr. Montoya. (AR. 19-20). But here the record is unclear on exactly how the ALJ crafted his RFC finding because Dr. Montoya opined that Ms. Campbell could do medium work, but the ALJ concluded that she could only do light work. As discussed, the ALJ rejected the opinion of Mr. Ramos that Ms. Campbell is limited to performing less than sedentary work. Thus, the ALJ failed to explain the basis of his RFC assessment because he did not articulate what medical and non-medical evidence he relied on in formulating his RFC finding and he does not appear to have relied on any of the medical opinions contained in the record. Accordingly, given the lack of medical support, it is not clear to the Court how the ALJ reached his finding about Ms. Campbell's RFC. *See Briscoe*, 425 F.3d at 352; *Bailey v. Barnhart*, 473 F.Supp.2d 842, 849-51 (N.D. Ill. 2006) (noting that if the ALJ rejects medical evidence he must explain how he made his RFC assessment

with specific citations to the record that shows he considered the relevant medical and non-medical evidence); *Jeffers v. Astrue*, No. 09 C 6225, 2010 WL 4876726, *19 (N.D. Ill. Nov. 19, 2010) ("By neglecting to flesh out the record in order to support her RFC assessment, the ALJ acted contrary to controlling case law that prohibits ALJ's from the temptation to 'play doctor' and substitute their own independent medical findings for those found in the record.") (citation omitted).

In crafting the RFC finding, the ALJ also did not explain why Ms. Campbell can perform light work despite her testimony that she could not stand or walk for long periods of time; she could only stand for 15 minutes until her side pain required her to sit and she could only walk four blocks. (AR. 36, 39). Light work requires the ability to stand or walk for up to six hours in an eight-hour workday. SSR 83-10, 1983 WL 31251, at *6. The applicable regulations state:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. §§ 404.1567(b); 416.967(b). The regulations further define frequently as "occurring from one-third to two-thirds of the time." SSR 83-10, 1983 WL 31251, at *6. Here, the ALJ did not explain why he rejected the above-recited portions of Ms. Campbell's testimony in light of her severe knee and back pain, and obesity when he crafted the RFC finding. Accordingly, the ALJ's lack of analysis here precludes meaningful judicial review and is therefore reversible error. *Clifford*, 227 F.3d at 870-71; *Briscoe*, 425 F.3d at 352-53 (reversing where the ALJ failed to set forth the basis for his RFC finding); *Scott*, 647 F.3d at 740-41 (reversing where the ALJ RFC analysis was based on unsupported assertions about the claimant's physical abilities).

Finally, the ALJ must consider "the aggregate effect of [the] entire constellation of ailments—including those impairments that in isolation are not severe." *Hisle v. Astrue*, 258 F. App'x 33, 36 (7th Cir. 2007) (alterations in original) (quoting *Golembiewski*, 322 F.3d at 918 (citing 20 C.F.R. § 404.1523)); *Mendez v. Barnhart*, 439 F.3d 360, 363 (7th Cir. 2006); *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005)). This includes obesity. SSR 02-1p requires an ALJ to consider obesity as a medically determinable impairment and the exacerbating effects of a claimant's obesity on her other conditions, even if the obesity is not itself a severe impairment, when arriving at the RFC assessment. *Hernandez v. Astrue*, 277 F. App'x 617, 624 (7th Cir. 2008); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). SSR 02-1p also reminds adjudicators that "[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity." SSR 02-1p, 2002 WL 34686281, at *6. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone." *Id.*

In this case, while the ALJ did find Ms. Campbell's obesity to be a "severe" impairment under 20 C.F.R. §§ 404.1520 and 416.920, the record does not show that the ALJ appropriately evaluated her obesity in combination with her other impairments, including her knee and lower back pain, when he assessed her RFC to perform light work. (AR. 18). Here, the ALJ failed to explain his analysis, merely noting the relevant legal standards, stating his application of them, and asserting his conclusion, which precludes this Court from engaging in meaningful judicial review. *Id.*; *see also Clifford*, 227 F.3d at 870; *Young*, 362 F.3d at 1002; SSR 96-8p. The ALJ's conclusory analysis amounts to reversible error because he does not articulate whether Ms. Campbell's obesity would impact her ability to stand, sit, walk, or otherwise perform the requirements of light work.

Therefore, his analysis falls short of the articulation requirement because he did not consider the combined effects of Ms. Campbell's obesity with her other impairments.

Given the multiple errors in the ALJ's RFC finding that Ms. Campbell can perform light work, a remand to reassess her RFC is warranted. *See Clifford*, 227 F.3d at 870. On remand, the Court directs the ALJ to explain the reasoning behind his RFC assessment and build a clear and logical bridge from the medical evidence to his finding. If necessary, the ALJ should consult a medical expert to flesh out the medical evidence in the record. *See Bailey*, 473 F.Supp.2d at 849-50 ("[h]aving rejected the available medical record upon which to base an RFC assessment, the ALJ was then required to call a medical advisor and/or obtain clarification of the record to flesh out what she needed to support her decision"). Furthermore, after the ALJ receives clarification from Mr. Ramos regarding his August 2009 opinion, the ALJ must factor Mr. Ramos's RFC assessment into his analysis.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief requested in Plaintiff's Memorandum in Support of Her Motion for Summary Judgment [DE 18] and **REMANDS** this matter for further proceedings consistent with this opinion.

SO ORDERED this 17th day of October, 2012.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record